ELMORE, Judge.
 

 *463
 
 Avery Joe Lail, Jr. (defendant) appeals from a judgment entered after a jury returned a general verdict finding him guilty of second-degree murder. Defendant argues the trial judge improperly sentenced him as a Class B1 felon based on a verdict failing to specify whether the jury found him guilty of Class B1 or B2 second-degree murder, which depends, in part, on which malice theory supported the conviction. We conclude defendant received a fair trial and a proper sentence.
 

 *464
 
 During defendant's murder trial, the State proceeded under a deadly weapon implied malice theory arising from defendant's alleged use of a butcher knife to slash the victim's throat. After the presentation of evidence, the judge instructed the jury on the definitions of express malice and deadly weapon implied malice (B1 second-degree murder) but not on depraved-heart malice (B2 second-degree murder). The judge charged the jury on first-degree murder, second-degree murder, and voluntary manslaughter. The jury returned a general verdict of guilty of second-degree murder.
 

 At sentencing, an issue arose about whether defendant should be sentenced as a B1 or
 
 *404
 
 B2 felon based on the jury's general verdict. Under our State's previous murder statute, all second-degree murders were B2 felonies. Under an applicable amendment to that statute, second-degree murder was reclassified as a B1 or a B2 felony based, in part, on whether depraved-heart malice supported the conviction. Over defendant's objection, the trial judge ruled that, based on the evidence presented and the jury instruction, the verdict supported sentencing defendant as a B1 felon.
 

 On appeal, defendant argues that since depraved-heart malice may have supported his conviction, the jury's general verdict did not support B1 punishment and requires he be resentenced as a B2 felon. We hold that since the jury was not presented with evidence supporting a finding of depraved-heart malice, its general verdict was unambiguous and his B1 sentence proper. Where, however, the jury is presented with both B2 depraved-heart malice and a B1 malice theory, a general verdict would be ambiguous and a B2 sentence would be proper. In this situation, trial judges for sentencing purposes should frame a special verdict requiring the jury to specify which malice theory supported its second-degree murder verdict.
 

 I. Background
 

 Just before 10:00 p.m. on 23 March 2014, Brian Dale Jones was found dead on a driveway located on Old Dowd Road in Mecklenburg County. His head and face had been beaten and bruised, his neck cut and stabbed repeatedly by a knife, and his right internal jugular vein severed. The autopsy on Brian's body revealed that he was extremely intoxicated at the time of his death, his blood alcohol level registering at .43 on the breathalyzer scale, but that he died of blood loss from his knife wounds.
 

 On 11 April 2014, Mark Huntley, defendant, and Joyce Delia Rick were arrested in connection with Brian's death. The three had been living together in Joyce's home for a few weeks before Brian arrived
 
 *465
 
 uninvited at Joyce's door on the night he died. During interviews with police, the three gave statements concerning the events surrounding Brian's homicide. On 21 April 2014, defendant was indicted on one count of first-degree murder. From 14 to 25 September 2015, defendant was tried in Gaston County Superior Court. The State's evidence generally established the following facts relevant to which malice theory supported the jury's verdict.
 

 Mark testified that he witnessed defendant murder Brian with a butcher knife. According to Mark's testimony, on 23 March 2014, he, defendant, and Joyce were in Joyce's living room watching a NASCAR race on television. Around 1:00 p.m., defendant and Mark began drinking. A few hours later that evening, Brian arrived at Joyce's home driving a green car belonging to Brian's girlfriend, Susan Braddy. Mark had previously dated Susan. Mark had met Brian a few times before and the two had gotten into an altercation about Susan once before at a convenience store. Brian brought with him a Duke's Mayonnaise jar full of moonshine, which he shared with defendant and Mark. Over the next hour or so, the four of them hung out and talked. Joyce did not drink. Mark took a few swigs of the moonshine, but defendant and Brian drank most of it. Defendant and Brian also smoked crack together.
 

 Once the moonshine was finished, Brian, heavily intoxicated, slurring his words and barely able to stand, started to leave Joyce's home in an attempt to drive home. Defendant tried to persuade Brian to sleep on the couch and sober up before driving but Brian refused. Defendant then helped Brian stumble outside to Susan's car and crawl into the vehicle. Mark followed. From outside the car, defendant continued to encourage Brian not to drive. Mark remained outside for a few minutes but then went back inside Joyce's home.
 

 When Mark returned outside a few minutes later, he noticed that Brian had backed Susan's car into the driveway and defendant was standing at the driver's side window continuing to argue with Brian. The argument turned into a fight, and defendant began punching Brian through the car window. Defendant then opened the driver's side door, pulled Brian out of the vehicle, and began punching, kicking, and stomping him. Mark grabbed defendant from behind and tried to stop defendant from beating Brian,
 
 *405
 
 but defendant hit Mark in the head and then continued to beat a defenseless Brian. Defendant, standing on Brian's chest, stopped hitting Brian and then declared that he would be right back. Defendant went inside Joyce's home and returned outside wielding a butcher knife with an eight-inch stainless steel blade. Defendant got back on top of Brian's chest. Mark asked defendant what he was doing.
 
 *466
 
 Defendant replied: "I'm gonna kill him" and then cut Brian's throat two or three times with the butcher knife.
 

 Defendant threatened to kill Mark if he did not help dispose of Brian's body. At this point, Brian was still alive but bleeding profusely, and the only sound Mark heard from Brian was "the gurgling of the blood in his throat and lungs." After an unsuccessful attempt to load Brian's body into Susan's vehicle, defendant and Mark loaded him into the back of Joyce's minivan. Defendant drove the minivan, and Mark followed in Susan's vehicle. At one point, Mark noticed Brian's arm dangling out of the back window and got defendant's attention. The two pulled over, loaded Brian's arm back into the minivan, and then continued driving. Brian was eventually dropped on Old Dowd Road in Mecklenburg County.
 

 Defendant and Mark then returned to Joyce's home, changed clothes, and started for South Carolina in Susan's car, leaving the minivan and without cleaning any of the blood. Over the next few days, defendant and Mark drove to South Carolina, and then to West Virginia, before returning to Charlotte and ditching Susan's car on a road near the U.S. Whitewater Center. Defendant called Joyce to come pick them up and then the three proceeded home, where they returned to sitting around watching television as if nothing ever happened until Mark was arrested a few days later.
 

 Joyce testified that she did not witness Brian's murder. According to Joyce's testimony, on 23 March 2014, she, defendant, and Mark were hanging around watching television in her home when she heard an unexpected knock on her door around 8:00 or 9:00 p.m. When she opened the door, she saw Brian standing there. Joyce had known Brian for about four or five years and had introduced Brian and Susan, Joyce's friend of nearly forty years, to each other about a year earlier. Brian and Susan were currently living together and dating.
 

 Joyce invited Brian into her home. Brian returned briefly to Susan's car and retrieved a jar of moonshine before coming inside and sitting down. He shared the moonshine with defendant and Mark, and the three passed it back and forth among them as they talked. Joyce did not sip any of the moonshine but took her nightly sleeping medicine that diminishes her mental faculties. Joyce was watching television when she heard an argument develop. She was unaware who was arguing or what they were arguing about but the men started to get loud. Joyce glanced over and saw Brian slam his fist into her glass coffee table. She told Brian to leave. Brian stood up and defendant said, "Let's go outside." All three men went outside.
 

 *467
 
 A few minutes later, defendant came back inside, looking angry and drunk, and told Joyce that "Brian slapped him and he kicked [Brian's] ass." Joyce thought defendant was bluffing and went down the hall to the bathroom. When she came out, defendant was no longer in her home. Joyce never saw Mark come back inside, and she never saw Brian again. Approximately twenty minutes later, defendant came back inside and told her that he was going to put gas into her minivan. About an hour after that, Mark and defendant returned to Joyce's home, their clothes appearing wet, and the two went down the hall to change. Joyce started the washing machine and Mark and defendant put in their clothes. About thirty to forty-five minutes later, Mark and defendant left again, and Joyce did not see them for several days.
 

 Defendant's evidence generally corroborated most of the State's evidence except for one major difference-that it was Mark who had cut Brian's neck.
 

 Defendant testified that he witnessed Mark murder Brian with a steak knife. According to defendant's testimony, during the evening of 23 March 2014, he returned from a trip to the bathroom to find Mark and Joyce arguing with someone at the door. Joyce introduced this person as Brian, Susan's
 
 *406
 
 boyfriend. Brian looked angry. Defendant had never met Brian before and did not know Susan. Right after they met, Brian asked defendant if he drank moonshine. Defendant replied that he did, and Brian got the moonshine from Susan's car. Defendant returned to the couch and continued watching television as Brian and Mark started bickering. The more moonshine Brian drank, the more Brian and Mark argued about Susan. Eventually, Brian slammed his fist into the coffee table. The slam woke up Joyce, who told Brian to leave.
 

 Mark escorted Brian outside and defendant followed. When they got to Susan's car, Mark and Brian started bickering again about Susan. Defendant stepped in between them to break up the fight. Brian backhanded defendant in the mouth, breaking defendant's artificial teeth. Defendant lost his temper and "beat the shit out of [Brian]," knocking him out and then kicking him in the face for good measure. Defendant then left Mark and Brian outside and went back inside Joyce's home. He saw Joyce and told her that he beat up Brian. About five minutes later, defendant returned outside and saw Mark kneeling beside Brian, giving the appearance that Mark was robbing Brian. When defendant grabbed Mark by the arm and pulled him back, he saw that Brian was covered in blood and that Mark had a knife. Defendant asked Mark why he had murdered Brian, and Mark responded that he had to do it for Susan.
 

 *468
 
 Mark then asked defendant to help him dispose of Brian's body, which he did.
 

 After the presentation of evidence, the trial court charged the jury on first-degree murder, second-degree murder, and manslaughter, and instructed on express malice and deadly weapon implied malice but not depraved-heart malice. On 25 September 2015, the jury returned a verdict finding defendant guilty of second-degree murder, not guilty of first-degree murder, and not guilty of manslaughter.
 

 At sentencing, an issue arose as to whether defendant should be sentenced as a Class B1 or B2 felon under recently amended
 
 N.C. Gen. Stat. § 14-17
 
 (b), which reclassified second-degree murder as either a Class B1 or B2 felony, based, in part, on whether depraved-heart malice supported the conviction. Both parties argued about which Class defendant should be sentenced under based on the jury's general verdict. Over defendant's objection, the trial judge ruled that the jury's verdict, properly interpreted, found defendant guilty of Class B1 second-degree murder. The trial judge reasoned:
 

 [R]eading the statute ... there would have to be some evidence that would allow some reckless and wanton manner theory to have been addressed by the jury in this case. The jury was given malice in the form of ... the use of a deadly weapon, which is certainly not a reckless and wanton manner-type argument. So ... the Court is going to find ... based on the evidence in this particular case that there was not any evidence to suggest that this act, while it may be based on an inherently dangerous act, was done in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberate mental mischief. So ... the Court is going to conclude that based on the evidence in this case, the jury instructions that were given and the findings of the jury ..., that this is a B-1 second-degree murder.
 

 Accordingly, the trial court sentenced defendant as a Class B1 felon to 483-592 months of imprisonment. Defendant gave timely oral notice of appeal.
 

 II. Analysis
 

 A. 2012 Amendment
 

 Defendant contends that amended
 
 N.C. Gen. Stat. § 14-17
 
 requires the jury to specify in every instance whether depraved-heart malice
 
 *469
 
 supported its verdict finding an accused guilty of second-degree murder. We disagree. Additionally, defendant contends that contrary to the parties and the trial judge's interpretation, depraved-heart malice as contemplated by section (b)(1) of the statute is not limited to driving while intoxicated homicide cases. We agree.
 

 Issues of statutory construction are questions of law reviewed
 
 de novo
 
 .
 

 *407
 

 In re Ernst & Young, L.L.P.
 
 ,
 
 363 N.C. 612
 
 , 616,
 
 684 S.E.2d 151
 
 , 154 (2009) (citation omitted). " 'The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent.' "
 

 Id.
 

 (quoting
 
 Burgess v. Your House of Raleigh, Inc.
 
 ,
 
 326 N.C. 205
 
 , 209,
 
 388 S.E.2d 134
 
 , 137 (1990) ). "When construing statutes, this Court first determines whether the statutory language is clear and unambiguous."
 
 Wiggs v. Edgecombe Cnty.
 
 ,
 
 361 N.C. 318
 
 , 322,
 
 643 S.E.2d 904
 
 , 907 (2007) (citation omitted). If it is, "we will apply the plain meaning of the words, with no need to resort to judicial construction."
 

 Id.
 

 (citation omitted). Additionally, the " '[l]egislature is presumed to know the existing law and to legislate with reference to it.' "
 
 State v. Davis
 
 ,
 
 198 N.C.App. 443
 
 , 451-52,
 
 680 S.E.2d 239
 
 , 246 (2009) (quoting
 
 State v. Southern R. Co.
 
 ,
 
 145 N.C. 495
 
 , 542,
 
 59 S.E. 570
 
 , 587 (1907) ).
 

 Malice is an essential element of second-degree murder.
 
 See, e.g.
 
 ,
 
 State v. Thomas
 
 ,
 
 325 N.C. 583
 
 , 604,
 
 386 S.E.2d 555
 
 , 567 (1989). North Carolina recognizes at least three malice theories:
 

 (1) "express hatred, ill-will or spite"; (2) commission of inherently dangerous acts in such a reckless and wanton manner as to "manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief"; or (3) a "condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification."
 

 State v. Coble
 
 ,
 
 351 N.C. 448
 
 , 450-51,
 
 527 S.E.2d 45
 
 , 47 (2000) (quoting
 
 State v. Reynolds,
 

 307 N.C. 184
 
 , 191,
 
 297 S.E.2d 532
 
 , 536 (1982) ). "The second type of malice [is] commonly referred to as 'depraved-heart' malice[.]"
 
 State v. Fuller
 
 ,
 
 138 N.C.App. 481
 
 , 484,
 
 531 S.E.2d 861
 
 , 864 (2000) (citing
 
 State v. Rich,
 

 351 N.C. 386
 
 ,
 
 527 S.E.2d 299
 
 (2000) ). This type of malice is frequently used to support second-degree murder convictions based on drunk driving.
 
 See, e.g.
 
 ,
 
 Rich,
 

 351 N.C. at 395
 
 , 527 S.E.2d at 304 (upholding second-degree murder conviction under depraved-heart malice theory where an intoxicated driver "inten[ed] to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind"). However,
 
 *470
 
 it is not limited only to situations involving drunk driving.
 
 See, e.g.
 
 ,
 
 State v. Bethea
 
 ,
 
 167 N.C.App. 215
 
 , 219-20,
 
 605 S.E.2d 173
 
 , 177 (2004) (upholding second-degree murder conviction under depraved-heart malice theory based on a sober driver's "reckless and wanton attempt to elude law enforcement");
 
 State v. Qualls
 
 ,
 
 130 N.C.App. 1
 
 , 10-11,
 
 502 S.E.2d 31
 
 , 37 (1998) (upholding second-degree murder conviction under depraved-heart malice theory based on a defendant's severe shaking of an infant-victim, causing his death),
 
 aff'd
 
 ,
 
 350 N.C. 56
 
 ,
 
 510 S.E.2d 376
 
 (1999) ;
 
 see also
 

 State v. Lilliston
 
 ,
 
 141 N.C. 857
 
 , 857-58,
 
 54 S.E. 427
 
 , 427 (1906) (upholding murder conviction under depraved-heart malice theory where the defendant in the crowded reception room of a railroad station engaged in a shootout, causing the death of an innocent bystander).
 

 N.C. Gen. Stat. § 14-17
 
 previously classified all second-degree murders, regardless of malice theory, as Class B2 felonies.
 
 See
 

 N.C. Gen. Stat. § 14-17
 
 (b) (2011) ("[A]ny person who commits [second-degree] murder shall be punished as a Class B2 felon."). In 2012, our General Assembly amended this statute, reclassifying second-degree murder as a Class B1 felony, except under two situations where it would remain a Class B2 felony.
 
 N.C. Gen. Stat. § 14-17
 
 (b) (2015) now provides in pertinent part:
 

 (b) .... Any person who commits second degree murder shall be punished as a Class B1 felon, except that a person who commits second degree murder shall be punished as a Class B2 felon in either of the following circumstances:
 

 (1) The malice necessary to prove second degree murder is based on an inherently dangerous act or omission, done in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.
 

 (2) The murder is one that was proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium, or cocaine or other substance described in G.S. 90-90(1) d., or
 
 *408
 
 methamphetamine, and the ingestion of such substance caused the death of the user.
 

 The plain language of this amendment, that persons convicted of second-degree murder "shall be punished as a Class B1 felon,
 
 except
 
 ," indicates clearly that the legislature intended to increase the sentence for second-degree murder to Class B1 and to retain Class B2 punishment only where either statutorily defined situation exists. Since only the second malice form recognized by judicial law, depraved-heart malice, was
 
 *471
 
 codified as mandating B2 punishment, it is clear the legislature intended a conviction based on the first or third malice forms to be treated as B1 second-degree murder. Logically, then, in a situation where no evidence is presented that would support a finding that an accused acted with depraved-heart malice, specification of malice theory would not provide clarity for sentencing purposes; it would be inferred from a general verdict that the jury found the accused guilty of B1 second-degree murder. Therefore, we conclude that amended
 
 N.C. Gen. Stat. § 14-17
 
 (b) does not always require a jury to specify whether depraved-heart malice theory supported its conviction.
 

 Additionally, section (b)(1) was drafted in a way virtually identical to the language developed by our case law and the pattern jury instruction used to describe depraved-heart malice.
 
 See
 

 Rich
 
 , 351 N.C. at 396, 527 S.E.2d at 304 (approving jury instruction describing depraved-heart malice as acts "inherently dangerous to human life ... done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief"). There is no language indicating an intent to limit depraved-heart malice as statutorily defined to only instances involving the reckless driving of an impaired driver. Thus, we interpret section (b)(1) as contemplating all forms of depraved-heart malice.
 

 B. Malice Theory Supporting the Jury's Verdict
 

 Defendant contends the trial court improperly sentenced him as a B1 felon based on the jury's general verdict, since the evidence presented may have supported a finding that he acted with depraved-heart malice. Therefore, defendant argues, the jury's verdict failing to specify whether depraved-heart malice theory supported its conviction did not authorize the trial judge to sentence him as a B1 felon but requires that he be resentenced as a B2 felon. We disagree.
 

 "When a judge inflicts punishment that the jury's verdict alone does not allow ... the judge exceeds his proper authority."
 
 Blakely v. Washington
 

 542 U.S. 296
 
 , 304,
 
 124 S.Ct. 2531
 
 ,
 
 159 L.Ed.2d 403
 
 (2004) (internal citation omitted);
 
 State v. Norris
 
 ,
 
 360 N.C. 507
 
 , 516,
 
 630 S.E.2d 915
 
 , 921 ("[T]rial courts are limited to whatever punishment the jury's verdict authorizes."),
 
 cert. denied
 
 ,
 
 549 U.S. 1064
 

 127 S.Ct. 689
 
 ,
 
 166 L.Ed.2d 535
 
 (2006). We review
 
 de novo
 
 whether the sentence imposed was authorized by the jury's verdict.
 
 See, e.g.
 
 ,
 
 State v. Silhan
 
 ,
 
 302 N.C. 223
 
 , 261-62,
 
 275 S.E.2d 450
 
 , 477-78 (1981) (reviewing
 
 de novo
 
 whether the defendant's sentence for an underlying felony was supported by a general verdict failing to specify which theory presented, (1) premedication and deliberation or (2) felony murder, supported the jury's finding
 
 *472
 
 that the defendant was guilty of first-degree murder),
 
 abrogated on other grounds by
 

 State v. Sanderson
 
 ,
 
 346 N.C. 669
 
 ,
 
 488 S.E.2d 133
 
 (1997).
 

 Additionally, "[w]here the jury is presented with more than one theory upon which to convict a defendant and does not specify which one it relied upon to reach its verdict, '[s]uch a verdict is ambiguous and should be construed in favor of [the] defendant.' "
 
 State v. Daniels
 
 ,
 
 189 N.C.App. 705
 
 , 709,
 
 659 S.E.2d 22
 
 , 25 (2008) (quoting
 
 State v. Whittington,
 

 318 N.C. 114
 
 , 123,
 
 347 S.E.2d 403
 
 , 408 (1986) (citation omitted)). " 'This Court is not free to speculate as to the basis of a jury's verdict.' "
 

 Id.
 

 (quoting
 
 Whittington,
 

 318 N.C. at 123
 
 ,
 
 347 S.E.2d at
 
 408 ). However, "[a] verdict may be given ... a proper interpretation by reference to the indictment, the evidence, and the instructions of the court."
 
 State v. Abraham
 
 ,
 
 338 N.C. 315
 
 , 359,
 
 451 S.E.2d 131
 
 , 155 (1994) (quoting
 
 State v. Hampton
 
 ,
 
 294 N.C. 242
 
 , 247-48,
 
 239 S.E.2d 835
 
 , 839 (1978) ).
 

 *409
 
 Defendant argues that the evidence presented may have supported a finding by the jury that he acted with B2 depraved-heart malice. Defendant cites to
 
 State v. Lilliston
 
 support his position that depraved-heart malice has been established where the reckless use of a deadly weapon caused another's death and points to the evidence presented at trial that (1) defendant and Brian had neither a prior relationship nor previous animosity between each other; and (2) defendant and Brian were extremely intoxicated. Defendant argues:
 

 Taking all of this evidence together, a reasonable juror could conclude that Brian['s] death from the knife wounds to his neck ... were ... the product of reckless and wanton acts by a man whose mind and judgment was so impaired by alcohol that he engaged in extremely dangerous acts with [a] knife in complete disregard for human life, acts which manifested a depraved mind deliberately bent on mischief.
 

 We disagree.
 

 In
 
 Lilliston
 
 , our Supreme Court held that the reckless use of a deadly weapon constituted a depraved-heart malice theory supporting a murder conviction.
 
 141 N.C. at 651
 
 ,
 
 54 S.E. at 427
 
 . In that case, the defendant and another man "were at a house of ill fame engaged in gambling and drinking" when "a difficulty sprung up ... between th[em] over charges of cheating."
 

 Id.
 

 The next day at the railroad station "in the crowded reception room they engaged in shooting at each other; the next room, separated only by a glass partition, being occupied by ladies and children."
 

 Id.
 

 *473
 
 [The other man] fired two shots, and then ran out of the east door, [the defendant] fired five shots; and these two men, who showed this contemptuous defiance of law, and of the lives of so many peaceable people who were entitled to the protection of the law in their lives and persons, escaped unharmed, while one bystander was killed, another seriously wounded, and others narrowly escaped.
 

 Id.
 

 Based on those facts, the
 
 Lilliston
 
 Court concluded that the men acted with depraved-heart implied malice sufficient to support murder by willingly engaging in a shootout in a crowded place when it was highly probable someone would be injured:
 

 The homicide occurred in a crowded waiting room. The doctrine is well settled that malice is implied when an act dangerous to others is done so recklessly or wantonly as to evince depravity of mind and disregard of human life, and, if the death of any person is caused by such an act, it is murder. The most frequent instance of this species of murder is where death is caused by the reckless discharge of firearms under such circumstances that some one would probably be injured, and even where the discharge was accidental, resulting from handling the weapon in a threatening manner it was held murder.
 

 Id.
 

 (citations and internal quotation marks omitted).
 

 Here, there is simply no evidence which would have supported a finding of depraved-heart malice or an instruction on that theory. Unlike in
 
 Lilliston
 
 , where the defendant was convicted of second-degree murder of an innocent bystander, no evidence was presented that defendant intended to kill someone other than Brian but slashed his neck by accident. The evidence neither suggested that defendant slashed around a knife so recklessly or wantonly that he inadvertently killed someone nor that defendant used an imprecise weapon or aimed so indiscriminately as to manifest a mind utterly without regard for human life and social duty. The evidence here showed that the repeated knife cuts were deliberately aimed at Brian's neck.
 

 In this case, defendant was indicted for first-degree murder. The State proceeded under a deadly weapon implied malice theory, which falls into the third malice category: That " 'condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.' "
 
 Coble
 
 , 351 N.C. at 451, 527 S.E.2d at 47 (quoting
 
 Reynolds,
 

 307 N.C. at 191
 
 ,
 
 297 S.E.2d at
 
 536 ).
 

 *474
 
 "[T]he third type of malice is established by 'intentional infliction of a wound with a deadly weapon which results in death.' "
 

 Id.
 

 (quoting
 
 Reynolds,
 

 307 N.C. at 191
 
 ,
 
 297 S.E.2d at
 
 536 ). "[M]alice is presumed
 
 *410
 
 where the defendant intentionally assaults another with a deadly weapon, thereby causing the other's death."
 
 State v. McNeill,
 

 346 N.C. 233
 
 , 238,
 
 485 S.E.2d 284
 
 , 287 (1997) (citation omitted),
 
 cert. denied,
 

 522 U.S. 1053
 

 118 S.Ct. 704
 
 ,
 
 139 L.Ed.2d 647
 
 (1998). A butcher knife is a deadly weapon.
 
 See, e.g.
 
 ,
 
 State v. Uvalle
 
 ,
 
 151 N.C.App. 446
 
 , 455,
 
 565 S.E.2d 727
 
 , 733 (2002) (citations omitted). However, deadly weapon implied malice is "not a conclusive, irrebuttable presumption."
 
 State v. Debiase
 
 ,
 
 211 N.C.App. 497
 
 , 509-10,
 
 711 S.E.2d 436
 
 , 444-45 (2011) (citations omitted) (holding that the mandatory presumption of deadly weapon malice was converted to a permissible inference when the defendant presented "evidence concerning the reason for which, manner in which, and circumstances under which he used" the deadly weapon).
 

 At trial, the State introduced evidence of deadly weapon implied malice by showing that defendant repeatedly slashed Brian's neck with a butcher knife, one large cut severing Brian's right internal jugular vein, proximately causing his death. Defendant wholly denied cutting Brian's neck with a knife and blamed Mark. Defendant never specifically rebutted deadly weapon implied malice nor advanced a depraved-heart malice theory argument. Nor did defendant request that the judge instruct the jury on depraved-heart malice. Accordingly, the trial judge submitted the charge under an express malice and deadly weapon implied malice theory and elected not to instruct on a depraved-heart malice theory. The judge instructed:
 

 For you to find the defendant guilty of first-degree murder the State must prove ... that the defendant intentionally and with malice killed the victim with a deadly weapon. Malice means not only hatred, ill will, or spite, as it is ordinarily understood to be sure that is malice, but it also means that condition of mind which prompts a person to take the life of another intentionally, or to intentionally inflict serious bodily harm which proximately results in another's death without just cause, excuse, or justification.
 

 If the State proves beyond a reasonable doubt that the defendant intentionally killed the victim with a deadly weapon, or intentionally inflicted a wound upon the victim with a deadly weapon that proximately caused the victim's death you may infer first that the killing was unlawful, and second, that it was done with malice, but you are not
 
 *475
 
 compelled to do so. You may consider this, along with all other facts and circumstances, in determining whether the killing was unlawful and whether it was done with malice.
 

 A deadly weapon is a weapon which is likely to cause death or serious injury. In determining whether the instrument involved was a deadly weapon you should consider its nature, the manner in which it was used, and the size and strength of the defendant as compared to the victim. A knife is a deadly weapon.
 

 ....
 

 If you find from the evidence beyond a reasonable doubt that ... the defendant, acting either by himself or acting together with other persons, intentionally and with malice wounded the victim with a deadly weapon thereby proximately causing the victim's death it would be your duty to return a verdict of guilty of second-degree murder.
 

 When considering the evidence presented and the instruction given, we conclude that there was no ambiguity in the jury's general verdict. No evidence presented would have supported a finding that defendant acted with B2 depraved-heart malice. The evidence presented supported only B1 theories of malice and the jury was instructed only on those theories. Therefore, although the jury was not instructed to answer under what malice theory it convicted defendant of second-degree murder, it is readily apparent from the evidence presented and instructions given that the jury, by their verdict, found defendant guilty of B1 second-degree murder.
 
 See, e.g.
 
 ,
 
 State v. Wiggins
 
 ,
 
 161 N.C.App. 583
 
 , 593,
 
 589 S.E.2d 402
 
 , 409 (2003) ("[T]he verdict sheets did not lack the required degree of specificity needed for a unanimous verdict if they could be properly understood by the jury based on the evidence presented at trial." (citation omitted)). Therefore, we hold
 
 *411
 
 that the trial judge properly sentenced defendant as a B1 felon.
 

 However, we note that a general verdict would be ambiguous for sentencing purposes where the jury is charged on second-degree murder and presented with evidence that may allow them to find that either B2 depraved-heart malice or another B1 malice theory existed. In such a situation, courts cannot speculate as to which malice theory the jury used to support its conviction of second-degree murder.
 
 See
 

 State v. Goodman,
 

 298 N.C. 1
 
 , 16,
 
 257 S.E.2d 569
 
 , 580 (1979) ("If the jury's verdict were general, not specifying the theory upon which guilt was found, the court would have no way of knowing what theory the jury used
 
 *476
 
 and would not have proper basis for passing judgment."). As a practical matter, where a general verdict would be ambiguous for sentencing purposes, trial courts should frame a special verdict requiring the jury to specify under which available malice theory it found the defendant guilty of second-degree murder.
 
 See
 

 State v. Blackwell
 
 ,
 
 361 N.C. 41
 
 , 46-49,
 
 638 S.E.2d 452
 
 , 456-58 (2006) (encouraging the use of special verdicts in criminal cases where appropriate and recognizing that "special verdicts are a widely accepted method of preventing
 
 Blakely
 
 error");
 
 State v. Sargeant
 
 ,
 
 206 N.C.App. 1
 
 , 10,
 
 696 S.E.2d 786
 
 , 793 (2010) ("[A] jury's specification of its theory ... is for purposes of sentencing proceedings."),
 
 writ allowed
 
 ,
 
 364 N.C. 331
 
 ,
 
 700 S.E.2d 743
 
 (2010), and
 
 aff'd as modified
 
 ,
 
 365 N.C. 58
 
 ,
 
 707 S.E.2d 192
 
 (2011).
 

 III. Conclusion
 

 N.C. Gen. Stat. § 14-17
 
 (b) reclassified second-degree murder into a Class B2 or a Class B1 felony based, in part, on whether depraved-heart malice supported the conviction. Where a jury is charged on second-degree murder and presented with evidence that may support a finding that an accused acted with B2 depraved-heart malice, trial courts for sentencing purposes should require the jury by special verdict to designate under which available malice theory it found the defendant guilty of second-degree murder. However, where, as here, no evidence presented would support a finding of B2 depraved-heart malice, a trial court may properly deduce from a general verdict that the jury found the defendant guilty of B1 second-degree murder. Accordingly, we find no error below and hold that the trial court properly sentenced defendant as a B1 felon.
 

 NO ERROR.
 

 Judges HUNTER, JR. and ENOCHS concurs.