IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-697

No. COA20-882

Filed 21 December 2021

Swain County, No. 14CRS050106

STATE OF NORTH CAROLINA

v.

ALEXANDER MICHAEL CRISP

Appeal by Defendant from judgment entered 16 September 2019 by Judge
Alan Z. Thornburg in Swain County Superior Court. Heard in the Court of Appeals
22 September 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Marissa K.
Jensen, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Candace
Washington, for Defendant-Appellant.*

COLLINS, Judge.

¶ 1          Defendant Alexander Crisp appeals from a judgment entered upon a jury
verdict of guilty of second-degree murder. Defendant argues that the trial court
plainly erred by omitting a jury instruction on the defense of accident. Defendant
also argues that the trial court erred by sentencing him as a Class B1 felon because
the jury's verdict was ambiguous in light of evidence that Defendant acted with a
depraved heart. Because there was insufficient evidence to support an accident

instruction and there was no evidence to support a depraved-heart theory of malice, we discern no error.

## I.    Procedural History

Defendant was indicted for first-degree murder on 10 March 2014.  Defendant was tried before a jury from 29 July to 16 September 2019.  The jury found Defendant guilty of second-degree murder.  The trial court sentenced Defendant, as a Class B1 felon with a prior record level of II, to 221 to 278 months in prison with credit for time served in pretrial confinement.  Defendant timely gave written notice of appeal.

## II.    Factual Background

In February 2014, Defendant, his girlfriend Summer Lynn Johnson, and their seven-month-old daughter were living in a trailer on the property of Defendant's parents.  Defendant's parents, Michael Crisp and Andrea Crisp ("Mr. Crisp" and "Mrs. Crisp") lived in a home nearby on the same property.

The evidence at trial tended to show the following:  On the morning of 19 February 2014, Defendant, Johnson, and their daughter were the only persons in the trailer.  Between 5:30 and 6:00 am, Defendant was asleep on the couch and woke to Johnson "yelling at [him] to wake up."  When Defendant saw their daughter "crawling down the hallway right through the kitchen," Defendant picked her up and began to make her a bottle.  Defendant estimated that he and Johnson were up for 30 to 40 minutes and continued to argue, "yell[ing] back and forth" and "confront[ing] each other."

¶ 5        During the argument, Johnson suffered a gunshot wound to her left eye. Defendant called 911 at 6:19 am. After the 911 dispatcher instructed him to perform CPR, Defendant ended the call and called his parents' home phone to reach his mother, who knew CPR. Defendant's parents both ran to the trailer, where they saw Defendant at the back door. Mrs. Crisp heard Defendant yell, "She shot herself in the eye." Mrs. Crisp entered the trailer and began to perform CPR on Johnson.

¶ 6        Two ambulances arrived at the trailer at 6:29 am. Paramedics and EMTs entered the trailer, went to the back bedroom where Johnson was laying, and directed Mrs. Crisp to discontinue CPR. The paramedics and EMTs noticed Defendant racking the slide of a pistol and requested that he put the gun down. The paramedics and EMTs' attempts to resuscitate Johnson were unsuccessful and Johnson was pronounced dead at 6:40 am.

¶ 7        At trial, the State's theory was that Johnson was planning to leave Defendant, the argument between Defendant and Johnson escalated, and Defendant intentionally shot Johnson. Defendant's theory was that Johnson shot herself either accidentally or intentionally. Defendant testified that he was not in the bedroom and did not fire the gun. Likewise, multiple witnesses testified that Defendant stated that he was outside the bedroom when the gun fired.

### III.    Discussion

## A. Accident Instruction

¶ 8        Defendant argues that the trial court plainly erred by failing to instruct the

jury on the defense of accident.

¶ 9        A party may not make the trial court's omission of a jury instruction "the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection[.]" N.C. R. App. P. 10(a)(2). Defendant neither requested an instruction on the defense of accident nor objected to the trial court's omission of such an instruction. However, because Defendant "specifically and distinctly" contends that the trial court's omission of an accident instruction amounted to plain error, we will review this issue for plain error. N.C. R. App. P. 10(a)(4); *State v. Smith*, 362 N.C. 583, 596, 669 S.E.2d 299, 308 (2008) (reviewing jury instructions for plain error where defendant failed to object at trial).

¶ 10       "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation omitted). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *Id.* (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)).

¶ 11       A trial court must

>    instruct the jury on all of the substantive features of a case.
>    This is a duty which arises notwithstanding the absence of
>    a request by one of the parties for a particular instruction.
>    All defenses arising from the evidence presented during the
>    trial constitute substantive features of a case and therefore

warrant the trial court's instruction thereon.

*Id.* at 381, 368 S.E.2d at 617 (citations omitted). "When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant." *State v. Mercer*, 373 N.C. 459, 464, 838 S.E.2d 359, 363 (2020) (quotation marks and citations omitted).

¶ 12        The defense of accident "is not an affirmative defense, but acts to negate the *mens rea* element of homicide." *State v. Lytton*, 319 N.C. 422, 425-26, 355 S.E.2d 485, 487 (1987) (citations omitted). "A killing will be excused as an accident when it is unintentional and when the perpetrator, in doing the homicidal act, did so without wrongful purpose or criminal negligence while engaged in a lawful enterprise." *State v. Riddick*, 340 N.C. 338, 342, 457 S.E.2d 728, 731 (1995) (citation omitted). "The defense of accident is triggered in factual situations where a defendant, without premeditation, intent, or culpable negligence, commits acts which bring about the death of another." *Id.* (quotation marks and citations omitted).

¶ 13        The evidence in the present case, when viewed in the light most favorable to Defendant, did not warrant an instruction on the defense of accident. To the contrary, when viewed in the light most favorable to Defendant, the evidence suggested that Defendant was not in the bedroom and did not shoot the gun: The dispatcher who fielded the 911 call from Defendant noted in the call log that Defendant "advised . . . that someone had shot themselves in the eye accidentally with his .22 pistol[.]"

Thomas Simmons, one of the paramedics who responded to the scene, testified that Defendant "made a comment that the gun wasn't supposed to go off, that she grabbed for the gun and it just went off[.]" Steven Howell, another paramedic, testified that he overheard Defendant state that "he couldn't believe there had been a bullet in the chamber. He couldn't believe that it was loaded." Howell further testified that Defendant stated that "during the argument . . . [Johnson] grabbed the barrel" and "stated several times that she would kill herself, that she would put a bullet in her head."

¶ 14　　Mr. Crisp testified that after he arrived at the trailer, Defendant was crying and said that "[h]e didn't know what happened" and "couldn't figure out what happened." Mr. Crisp was within earshot of Defendant's conversation with Sergeant Dennis Elliott of the Swain County Sheriffs' Department. Mr. Crisp testified that he heard Defendant say to Elliott

> that Summer threatened to shoot [Defendant] in the head.
> . . . He said that he was fixing a bottle at the kitchen sink
> and . . . [h]e started back into the bedroom and he heard a
> pop or heard something and saw a small flash, and he
> thought that maybe she had shot into the wall.

¶ 15　　Mr. Crisp further testified that he heard Defendant say "that he wasn't even to the bedroom" when he heard the pop and saw the flash. Mr. Crisp also testified that he watched Defendant walk with Elliott down the hallway, Defendant "showed [Elliott] how far down the hall he had gotten," and Defendant "stopped before going in the door of the bedroom and said, I got right about here and I heard a pop and a

flash." At trial, Mr. Crisp listened to the portion of the 911 call recorded after he arrived at the scene and testified that Defendant stated that the gun was "[h]alf cocked, and it fell off the dresser or something and shot her in the F'ing eye" or was "on f[***]ing half cocked. It moved on the table and shot her in the f[***]ing eye."

¶ 16 Mrs. Crisp testified that when she arrived at the trailer, she heard Defendant screaming that Johnson had "shot herself in the eye" and Defendant stated, "I don't know if she grabbed the barrel of the gun and it went off. I don't know what happened." Mrs. Crisp also testified that Defendant stated, "I don't know how she did this. I don't want people to think Summer committed suicide. I don't know what happened." Mrs. Crisp further testified that while she was in the trailer, Defendant

> was crying. He was saying he didn't know what happened. He said they had been arguing[;] that [Defendant's daughter] had gotten up and wanted a bottle; that Summer called him a piece of S dad and he called her a piece of S mom; and he was trying to figure out what could have happened. He said that he was in the kitchen fixing a bottle and that he heard a pop and may have seen a flash and that he was trying to figure out what happened.

Mrs. Crisp indicated that, while she was performing CPR on Johnson, she "saw [Defendant] move what [she] thought was a gun" near Johnson's lap.

¶ 17 Elliott testified that Defendant denied having had an altercation with Johnson during which he "grabbed the gun and pointed it at [Johnson,] and she grabbed the end of the barrel and the gun accidentally went off." Elliott testified that instead, Defendant stated that his daughter was

> in his arms. The argument got heated enough to where . . . [Johnson] told him she'd just get a gun and blow his brains out.
>
> [Defendant] stated he took off running with the baby into the kitchen, got into the kitchen area, turned back around and told her, "Then do it. Just shoot me. Just shoot me." And as he started back towards the bedroom, he heard a pop. He walked into the bedroom and found [Johnson] laying in the bedroom floor.

Elliott also stated that Defendant said that he found the gun between Johnson's legs and that Defendant did not know how Johnson got the gun.

¶ 18 At trial, Defendant repeatedly denied that he shot Johnson, that he was in the room when the shooting occurred, or that he saw how the fatal shot occurred. According to Defendant, during the argument on the morning of 19 February

> [Johnson] screamed back the "I'll put a bullet in your head" thing. That was just a blank statement that she would just say. It's just something she wanted to get off her chest. It's just something she wanted to say. . . .
>
> And so me and [my daughter] go to walk down the hallway. I said, "Well, do it then." I made it to about right at the doorway, I'd say, within a couple of steps to the doorway. And the lights were off and everything and it was relatively loud, but there was a pop or the snap. And you could see a flash and almost instantly there was this smell in the room. I guess it was the smell of blood, smell of lead or powder.

Defendant testified numerous times that he did not have the gun that morning until he took it out of Johnson's lap after his mother had begun to perform CPR.

¶ 19 Defendant also repeatedly testified that he was unsure of how Johnson suffered the fatal shot. Defendant testified that on the morning of the shooting:

> I was just trying to figure out what happened. I mean a million things were running through my mind like, [h]ow did this happen? And so like I told mom, maybe she picked up the gun muzzle first and it just went off. I'm not saying that's what happened. That's what I thought could have happened.
>
> And I said, you know, maybe it fell off the dresser and went off. Not once did I say that's what happened. That's what I thought could have happened. Because that was what I was going to do, I was going to sit there and figure it out. I wanted to know what happened.
>
> To this day I don't know what happened. I will never know what happened. I didn't see it happen. I never said I saw it happen. But almost instantly I wanted to know what happened. I wanted to figure it out.

Defendant expressly rejected the possibility that he "could have been in a fight and [he] could have grabbed the gun and it could have gone off accident[ally]."

¶ 20 The foregoing evidence, when viewed in the light most favorable to Defendant, does not suggest that he perpetrated the shooting and "did so without wrongful purpose or criminal negligence while engaged in a lawful enterprise." *Riddick*, 340 N.C. at 342, 457 S.E.2d at 731 (citation omitted).

¶ 21 Defendant argues that the 911 call introduced by the State, in which he characterized the shooting as accidental, supported an accident instruction. But at trial, Defendant explained that he was attempting to inform the 911 dispatcher that Johnson had accidentally shot herself, not that he had accidentally shot Johnson. After listening to the call, Defendant testified as follows:

> Q. Now, when you say accidental discharge, what are you referring to?

> A. Well, I've always felt like, you know, on her part it was
> an accident. I never wanted to believe it was intentional. I
> still don't want to believe it's intentional. . . .
>
> So when I said accidental discharge that's because
> when I saw her last 10 minutes before me and [my
> daughter] got to the door and heard the pop, she did not
> have the gun in her hand. She was standing behind the
> bed the last time I saw her.

Moreover, the dispatcher noted in the call log that Defendant "advised . . . that someone had shot themselves in the eye accidentally with his .22 pistol," not that Defendant reported he had accidentally shot someone. The 911 call was therefore not sufficient evidence to entitle Defendant to an instruction on accident.

¶ 22 Defendant also argues that testimony by Dennis McGaha, an informant for the State, supported an instruction on accident. McGaha testified that he was incarcerated with Defendant in the Swain County Detention Center in February and March of 2014. McGaha testified that:

> [Defendant] told me what caliber pistol it was of the gun
> that went off and hit her. He was telling me that they
> argued and stuff beforehand, that this wasn't the first time
> that a gun had been involved in things between them in a
> heated matter and that there was a child in the home . . .
> while it was happening.
>
> . . . .
>
> He said that they were both kind of wrestling over
> the gun and that it went off. I mean his hands was on the
> gun the same as hers, and that he was holding the baby.
>
> . . . .
>
> And that that day he just said that they was

> wrestling over - - they was arguing over the baby, who was going to take off with the baby and drugs. One of them was doing drugs and one of them wasn't, something like that is what he said. And just things happened and the gun went off. . . .

Defendant's own testimony that he was not in the bedroom and did not fire the gun contradicted McGaha's testimony. Defendant strenuously denied that he spoke with McGaha about the shooting and sought to impeach McGaha's credibility. Defendant may not rely on McGaha's testimony, which he flatly contradicted and extensively impeached, to contend that he was entitled to an instruction on a theory he personally disclaimed at trial. *See State v. Henderson*, 64 N.C. App. 536, 540-41, 307 S.E.2d 846, 849 (1983) ("[A]s a practical matter, it is important to note that the defense of coercion or duress was not raised by the defendant, but by a State's witness . . . [whose] credibility was severely impeached by the defendant . . . .").

Defendant argues that he is permitted to rely on inconsistent defenses. This argument is without merit. Defendant cannot simultaneously deny that he committed the shooting and claim that he accidentally committed the shooting. *Cf. State v. Keller*, 374 N.C. 637, 647, 843 S.E.2d 58, 65-66 (2020) (A defendant who "claims he has not done an act" is not entitled to an entrapment instruction because he cannot simultaneously "claim that the government induced him to do that act."); *see also State v. Peterson*, 24 N.C. App. 404, 408-09, 210 S.E.2d 883, 886 (1975) (trial court did not err by instructing jury that self-defense was inapplicable where the defense was inconsistent with defendant's testimony and otherwise unsupported by

the evidence).

The evidence, when viewed in the light most favorable to Defendant, does not suggest that Defendant "commit[ed] acts which [brought] about the death of" Johnson. *Riddick*, 340 N.C. at 342, 457 S.E.2d at 731 (quotation marks and citations omitted). Because there was not sufficient evidence to entitle Defendant to an instruction on the defense of accident, the trial court did not err by omitting an instruction on that defense.

**B. Sentencing**

Defendant next argues that the jury's verdict of guilty of second-degree murder was ambiguous for sentencing purposes because there was evidence that would support sentencing as either a Class B1 or a Class B2 felony conviction. Defendant contends that this Court should therefore vacate Defendant's sentence and remand for resentencing as a Class B2 felony. We disagree.

"Second-degree murder is defined as (1) the unlawful killing, (2) of another human being, (3) with malice, but (4) without premeditation and deliberation." *State v. Arrington*, 371 N.C. 518, 523, 819 S.E.2d 329, 332 (2018) (quotation marks and citation omitted).

> Malice may be shown in at least three different ways: (1) actual malice, meaning hatred, ill-will or spite; (2) an inherently dangerous act done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief; or (3) that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse,

or justification.

*Id.* (quotation marks and citations omitted). "The second type of malice [is] commonly referred to as 'depraved-heart' malice[.]" *State v. Fuller*, 138 N.C. App. 481, 484, 531 S.E.2d 861, 864 (2000) (citation omitted).

"[T]he crime of second-degree murder has two potential classifications, B1 and B2, depending on the facts of the murder." *Arrington*, 371 N.C. at 522, 819 S.E.2d at 332. While second-degree murder is generally classified as a B1 offense, it is classified as a B2 offense where depraved heart malice is used prove the offense. N.C. Gen. Stat. § 14-17(b) (2019).

A jury need not specify which theory of malice was the basis of its verdict finding a defendant guilty of second-degree murder. *State v. Lail*, 251 N.C. App. 463, 471, 795 S.E.2d 401, 408 (2016).

> [I]n a situation where no evidence is presented that would support a finding that an accused acted with depraved-heart malice, specification of malice theory would not provide clarity for sentencing purposes; it would be inferred from a general verdict that the jury found the accused guilty of B1 second-degree murder.

*Id.* However, "a general verdict would be ambiguous for sentencing purposes where the jury is charged on second-degree murder and presented with evidence that may allow them to find that either B2 depraved-heart malice or another B1 malice theory existed." *Id.* at 475, 795 S.E.2d at 411.

Here, the jury's verdict was not ambiguous because there was no evidence in

support of depraved-heart malice. Defendant contends that this case is analogous to

*State v. Mosley*, 256 N.C. App. 148, 806 S.E.2d 365 (2017), but Defendant's reliance

is misplaced. There,

> defendant testified that as he was arguing with the victim,
> he was holding the rifle with his finger on the trigger and
> without the safety on. Defendant stated this was how he
> always handled the rifle—finger on the trigger and no
> safety. Defendant testified that in this instance, the gun
> went off when the victim grabbed the barrel of the rifle and
> he pushed her away. There was also testimony about the
> safety on the rifle and testimony from a firearm expert that
> "[y]ou would never teach anyone to have their finger on the
> trigger until they are ready to fire."

*Id.* at 152-53, 806 S.E.2d at 368. This Court noted that reckless use of a deadly

weapon constitutes depraved-heart malice and held that this was sufficient evidence

from which the jury could have found depraved-heart malice. *Id.*

¶ 31     Here, by contrast, Defendant argues that the jury could have found depraved

heart malice based on (1) Defendant's testimony that he left the gun on the

nightstand with the safety off and an empty chamber; (2) Simmons' testimony that

Defendant "made a comment that the gun wasn't supposed to go off," and "that

[Johnson] grabbed for the gun and it just went off"; (3) Howell's testimony that

Defendant "stated that sometime during the argument [Johnson] grabbed the barrel";

and (4) McGaha's testimony. Evidence that Defendant left an empty-chambered gun

unattended, or that Johnson grabbed the gun, which Defendant maintains he did not

use and believed was unloaded, is insufficient to show that Defendant committed "an

inherently dangerous act . . . so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief[.]" *Arrington*, 371 N.C. at 523, 819 S.E.2d at 332 (quotation marks and citation omitted).

¶ 32    The evidence tending to show Defendant's guilt supported only B1 theories of malice and the jury was instructed only on those theories. Although the jury returned a general verdict convicting Defendant of second-degree murder, it is apparent from the evidence presented and instructions given that the jury, by their verdict, found Defendant guilty of B1 second-degree murder. The trial court did not err by sentencing Defendant as a Class B1 felon.

¶ 33    Defendant argues in the alternative that the trial court plainly erred by failing to instruct the jury on the definition of depraved-heart malice. But for the same reasons that there was insufficient evidence from which the jury could have found depraved-heart malice, there was insufficient evidence to warrant an instruction on depraved-heart malice. The trial court did not err by omitting an instruction on depraved-heart malice.

## IV.    Conclusion

¶ 34    The evidence admitted at trial, viewed in the light most favorable to Defendant, did not warrant an instruction on the defense of accident. Because there was not sufficient evidence of depraved-heart malice, the jury's verdict of second-degree murder was not ambiguous for sentencing purposes, and the trial court did not err by sentencing Defendant as a Class B1 felon.

NO ERROR.

Judges DILLON and WOOD concur.