IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-1194

 Filed: 5 November 2019

Robeson County, Nos. 13 CRS 54359, 3511

STATE OF NORTH CAROLINA

 v.

CLARENCE WENDELL ROBERTS, Defendant.

 Appeal by Defendant from judgment entered 5 May 2017 by Judge James

Webb in Robeson County Superior Court. Heard in the Court of Appeals 6 August

2019.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General L.
 Michael Dodd, for the State-Appellee.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Nicholas
 C. Woomer-Deters, for Defendant-Appellant.

 COLLINS, Judge.

 Defendant Clarence Wendell Roberts appeals from judgment entered upon

jury verdicts of guilty of second-degree murder and assault with a deadly weapon.

Defendant argues that the trial court committed certain evidentiary and sentencing

errors. We find no prejudicial error.

 I. Procedural History

 On 9 September 2013, Defendant was indicted for first-degree murder, three

counts of attempted first-degree murder, and three counts of assault with a deadly
 STATE V. ROBERTS

 Opinion of the Court

weapon with intent to kill. A trial commenced on 10 April 2017. At the close of the

State’s evidence, the trial court granted Defendant’s motion to dismiss some of the

charges. On 5 May 2017, the jury found Defendant guilty of second-degree murder

and assault with a deadly weapon. The trial court consolidated the offenses and

entered judgment upon the jury’s verdicts, sentencing Defendant to 300 to 372

months’ imprisonment. Defendant gave oral notice of appeal in open court.

 II. Factual Background

 On the evening of 14 June 2013, approximately twelve people, including John

Allen, Michael Burgess, and Joshua Council, were playing basketball at a park in the

Hayeswood Hut area of Lumberton. During their breaks, they talked and had drinks

beside their cars parked in the grassy area between the basketball court and

Peachtree Street. Allen and Burgess were affiliated with the E-Ricket Hunter Bloods

street gang. Allen’s sister, her three-year-old daughter, and one of the sister’s friends

were hanging out by the cars, watching them play basketball. At about 9:00 or 9:30

p.m., a shooting occurred, and Council was killed.

 Allen testified that while he, his sister, and Council were standing beside

Council’s Chevrolet Blazer, a white Ford Taurus with its windows rolled down came

“kinda fast” down Peachtree Street. The driver, who was the only person in the car,

yelled “all y’all mother***ers want to kill me.” The car drove past them, slowed down,

and spun backward before stopping beside the Blazer. Allen thought the driver was

 -2-
 STATE V. ROBERTS

 Opinion of the Court

drunk. A black male with a “bald head or either a real close haircut” got out of the

car. Then, Allen saw the driver shooting and heard a total of five gunshots coming

from “where the car was[,]” but he did not see the gun that was being fired. Allen

and others ran away from the basketball area. The white Taurus then drove away.

 Burgess testified that when he and his friends were taking a break in the

grassy area beside the court, a white car partially covered in black primer drove by,

backed up, and “whipped” in front of them. Burgess could see that the driver was a

black male with tattoos on his face and gold teeth, and he was the only person in the

car. After the driver yelled “y’all gonna kill me,” someone shot at the car. Burgess

heard more shots coming from the white car and started running.

 Sheena Britt lived right around the corner from Hayeswood Hut. On the night

of the shooting, Britt was walking with a friend through an intersection near the

park. She saw a white four-door car drive past her toward the basketball court. The

driver, a black male with gold teeth, was hanging out of the window and yelling “ain’t

nobody going to mess with me.” Britt thought he had been drinking. Just after the

car turned down Peachtree Street, Britt heard gunshots. She later identified

Defendant in a photo lineup at the police station, but she could not identify him in

court.

 Whitney Carter lived at the corner of Peachtree Street and Eleventh Street.

Carter was sitting in her car in her driveway between 9:00 and 10:00 p.m. on the

 -3-
 STATE V. ROBERTS

 Opinion of the Court

night of the shooting when she saw a white car drive by, intermittently “throwing on

its brakes.” Carter observed that the driver was the only person in the car. She saw

the car stop briefly at the intersection while the driver talked to two pedestrians. The

car then “sped down the dirt road.” While still sitting in her car in her driveway

about five minutes later, Carter heard gunshots. She waited a few minutes, then got

out of her car and walked to the edge of Peachtree Street. When Carter looked down

Peachtree Street, she saw the white car parked beside the basketball court. Then the

car drove away toward Elizabethtown Road, and people were running.

 Ronnie Roberson’s house faced the Hayeswood Hut basketball court. On the

night of the shooting, Roberson watched black-and-white surveillance video of the

basketball court, captured by an infrared camera mounted on the side of his house.

He observed people talking around the basketball court. He also watched as a dark

car came down the road, backed up near the court slowly, and sat with its engine

running. Then shots were fired. Roberson did not see any other cars in the area. He

called 911 twice—first to report the loud noise coming from the basketball court, and

then to report the gunshots.

 Kimberly Lowery, the mother of Defendant’s son, testified that Defendant

showed up sometime after 9:30 p.m. at her home on Elizabethtown Road, visibly

drunk and driving a white Ford Taurus. Two other witnesses who knew Defendant

 -4-
 STATE V. ROBERTS

 Opinion of the Court

testified that Defendant visited them in Lumberton that night on or after 10:00 p.m.,

driving a white car.

 Chris McGirt, who lived near Hayeswood Hut, was on his way home from work

around 11:20 p.m. when he noticed a white Ford Taurus “driving strangely” down his

street. When McGirt parked in his driveway, the white car pulled up beside him in

the driveway. A black male, about 5’9” to 6’ tall and 160 to 170 pounds with gold

teeth, got out of the white car. After asking McGirt a few questions, the man got back

in the car, started the engine, and backed out of the driveway while yelling that he

was a “gangster.” McGirt thought the driver was impaired. After the man drove

away, McGirt called the police to report the suspicious activity. Two days later, when

McGirt visited the police station to make a statement, he identified Defendant in a

photo lineup.

 After midnight, Trooper Steven Hunt of the North Carolina Highway Patrol

found a white Ford Taurus in a ditch beside the highway. The engine was running,

the taillights were on, and Defendant was asleep inside, leaning against the steering

wheel. When Defendant woke up and tried to put the car in drive, the officer pulled

him out of the car, noticing that he was impaired. Hunt arrested Defendant for

driving while impaired.

 III. Issues

 -5-
 STATE V. ROBERTS

 Opinion of the Court

 On appeal, Defendant argues that (1) the trial court erred and violated his

right to confrontation by admitting recordings of his phone calls from jail, (2) the trial

court plainly erred by admitting videos of his interviews with investigators, (3) the

sentence imposed was not authorized by the jury’s verdict, and (4) the trial court

erred in calculating Defendant’s prior record level.

 IV. Discussion

A. Recorded Phone Calls

 Defendant argues that the trial court erred by admitting recordings of three

phone calls Defendant made from the Robeson County Jail. Defendant specifically

contends that (1) the recordings of the phone calls contained inadmissible hearsay,

and (2) by allowing the jury to hear the phone calls, the trial court violated

Defendant’s right to confront witnesses against him.

 Defendant first argues that the recorded phone calls were erroneously

admitted because they contained inadmissible hearsay.

 This Court conducts de novo review of the admission of evidence over a hearsay

objection. State v. Johnson, 209 N.C. App. 682, 692, 706 S.E.2d 790, 797 (2011). An

erroneous admission of hearsay necessitates a new trial only if the defendant shows

that there is a reasonable possibility that without the error the jury would have

reached a different result. N.C. Gen. Stat. § 15A-1443(a) (2018); State v. Wilkerson,

 -6-
 STATE V. ROBERTS

 Opinion of the Court

363 N.C. 382, 415, 683 S.E.2d 174, 194 (2009) (internal quotation marks and citation

omitted).

 “Hearsay is a statement, other than one made by the declarant while testifying

at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”

N.C. Gen. Stat. § 8C-1, Rule 801(c) (2018). “Hearsay is not admissible except as

provided by statute or by these rules.” N.C. Gen. Stat. § 8C-1, Rule 802 (2018).

However, a statement, other than one made by the declarant while testifying at the

trial or hearing, offered in evidence for a purpose other than to prove the truth of the

matter asserted is admissible. Livermon v. Bridgett, 77 N.C. App. 533, 540, 335

S.E.2d 753, 757 (1985).

 During one of the calls, Roberts repeatedly expressed bewilderment about

being accused of murder. In another call, a woman urged Defendant to request a “lie

detector test,” to which Defendant replied, “They ain’t do none of that.” One of the

women also told Roberts he should have “come back home.” Referring to another

person, the woman said, “She say, her baby daddy say, whenever you got around, he

and them other dudes were trying to tell you to go home, but you wouldn’t leave.”

 The State argues that these statements were admissible because (1) they were

not hearsay, as they were introduced only to prove the existence of the statements

and to show Defendant’s state of mind under evidentiary Rule 803(3), rather than to

 -7-
 STATE V. ROBERTS

 Opinion of the Court

prove the truth of the matters asserted, and (2) they were excepted from hearsay

under evidentiary Rule 801(d), as an admission of a party opponent.

 We need not determine whether the trial court erred because, even assuming

arguendo that the evidence was erroneously admitted, Defendant fails to show that

the error was prejudicial. See N.C. Gen. Stat. § 15A-1443(a). The State presented

the following evidence:

 Britt saw a white four-door car drive past her toward the Hayeswood Hut area

basketball court. The driver, a black male with gold teeth, was hanging out of the

window and yelling “ain’t nobody going to mess with me.” Britt thought he had been

drinking. Just after the car turned down Peachtree Street, Britt heard gunshots. She

later identified Defendant as the driver in a photo lineup.

 Allen was standing beside Council’s Chevrolet Blazer next to the basketball

court when a white Ford Taurus came down Peachtree Street. The driver, a black

male who appeared drunk and was the only person in the car, yelled “all y’all

mother***ers want to kill me.” The car drove past Allen, slowed down, and spun

backward before stopping beside the Blazer. Allen then saw the driver shooting and

heard a total of five gunshots coming from where the car was.

 Burgess was standing next to the basketball court when a white car whipped

in front of him. The driver, a black male with tattoos on his face and gold teeth, was

 -8-
 STATE V. ROBERTS

 Opinion of the Court

the only person in the car. After the driver yelled “y’all gonna kill me,” someone shot

at the car. Burgess heard more shots coming from the white car.

 Carter was sitting in her car in her driveway at the corner of Peachtree Street

between 9:00 and 10:00 p.m. when she saw a white car drive by. The driver was the

only person in the car. The car stopped briefly at the intersection and then sped down

Peachtree Street. Carter heard gunshots and she walked to the edge of Peachtree

Street. She saw the white car parked beside the basketball court. Then the car drove

away toward Elizabethtown Road, and people were running.

 Defendant showed up visibly drunk at Lowery’s house on Elizabethtown Road

in a white Ford Taurus sometime after 9:30 p.m.

 McGirt saw a white Ford Taurus driving strangely down his street near

Hayeswood Hut around 11:20 p.m. The car pulled into McGirt’s driveway and the

driver, a black male with gold teeth, got out. McGirt thought the driver was impaired.

After asking McGirt a few questions, the driver got back in the car and drove away

while yelling that he was a “gangster.” Two days later, McGirt identified Defendant

as the driver in a photo lineup.

 After midnight, Trooper Hunt found Defendant asleep in the driver’s seat of a

white Ford Taurus in a ditch beside the highway. Defendant was intoxicated and

was arrested for driving while impaired.

 -9-
 STATE V. ROBERTS

 Opinion of the Court

 Given this overwhelming evidence of guilt, we conclude that there is no

reasonable possibility that had the jury not heard the phone calls, it would have

reached a different result. See State v. Clevinger, 249 N.C. App. 383, 391, 791 S.E.2d

248, 254 (2016) (holding error harmless in light of other evidence against defendant,

including witness identification in photo lineup). We therefore find no prejudicial

error.

 Defendant also argues that by admitting the recordings, the trial court violated

his right to confront witnesses against him. Defendant specifically argues that the

women’s statements in the recorded phone calls were testimonial because the

Robeson County Jail telephone system provided automated warnings at the

beginning of and during each phone call, indicating that the calls would be recorded

and were subject to monitoring.

 This Court conducts de novo review of an alleged violation of a constitutional

right. State v. Graham, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009).

 A criminal defendant has a right to confront witnesses against him. U.S.

Const. amend. VI; Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009) (applied

the Sixth Amendment to states through Fourteenth Amendment); N.C. Const. art. I,

Section 23. This right is violated when a “‘testimonial’ statement from an unavailable

witness is admitted against a defendant who did not have a prior opportunity to cross-

 - 10 -
 STATE V. ROBERTS

 Opinion of the Court

examine the declarant.” State v. Garner, 252 N.C. App. 393, 400, 798 S.E.2d 755, 760

(2017) (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)).

 While the United States Supreme Court has deferred “any effort to spell out a

comprehensive definition of ‘testimonial,’” Crawford, 541 U.S. at 68, it has specifically

limited the reach of the Confrontation Clause to those statements “made under

circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial.” Id. at 52. “As a result of the

fact that ‘[t]estimony . . . is typically [a] solemn declaration or affirmation made for

the purpose of establishing or proving some fact[,]’” testimonial statements typically

include: (1) statements made to police officers during custodial interrogation; (2) ex

parte in-court testimony or its functional equivalent, such as affidavits, prior

testimony that the defendant was unable to cross-examine, or similar pretrial

statements that declarants would reasonably expect to be used prosecutorially; and

(3) extrajudicial statements contained in formalized testimonial materials such as

affidavits, depositions, prior testimony, or confessions. State v. Miller, 371 N.C. 273,

281-82, 814 S.E.2d 93, 98-99 (2018) (quoting Crawford, 541 U.S. at 51) (other citations

omitted).

 In conducting this inquiry into the circumstances surrounding a statement, a

declarant’s knowledge that he is being recorded is not dispositive. Even if parties to

a jailhouse phone call with a defendant were aware that the jail was recording their

 - 11 -
 STATE V. ROBERTS

 Opinion of the Court

conversation, their understanding that a statement could potentially serve as

evidence in a criminal trial does not necessarily denote “testimonial” intent. See

Davis v. Washington, 547 U.S. 813, 822 (2006) (holding that statements made during

911 emergency phone call were nontestimonial when uttered only “to enable police

assistance to meet an ongoing emergency”); United States v. Jones, 716 F.3d 851, 856

(4th Cir. 2013) (holding that statements made during recorded jailhouse phone calls

were nontestimonial because declarants did not demonstrate anywhere in the

conversations an intent to “bear witness” against defendant).

 We agree with the Fourth Circuit’s reasoning in Jones that a prison, similar to

911 emergency services, “has a significant institutional reason for recording phone

calls outside of procuring forensic evidence—i.e., policing its own facility by

monitoring prisoners’ contact with individuals outside the prison.” Jones, 716 F.3d

at 856. “To adopt the rule Defendant proposes would require us to conclude that all

parties to a jailhouse phone call categorically intend to bear witness against the

person their statements may ultimately incriminate.” Id. Moreover, nowhere in the

conversations between Defendant and the women do the women demonstrate an

intent to “bear witness” against Defendant. There is no evidence that their

conversation consisted of anything but “casual remark[s] to an acquaintance.”

Crawford, 541 U.S. at 51. Because we are satisfied that the statements made by the

 - 12 -
 STATE V. ROBERTS

 Opinion of the Court

women in the jailhouse telephone calls were not testimonial, their admission did not

violate the Confrontation Clause.

B. Interviews with Police

 Defendant next argues that the trial court erred by admitting into evidence

video interviews in which Defendant and investigators discussed prior assault and

rape charges against Defendant that had been dismissed. Defendant specifically

contends that this evidence was irrelevant and was inadmissible character evidence.

 Defendant acknowledges his failure to object to the admission of this evidence,

but specifically argues plain error on appeal. See N.C. R. App. P. 10(a)(4). The plain

error rule should be “applied cautiously and only in the exceptional cases where, after

reviewing the entire record, it can be said the claimed error . . . resulted in a

miscarriage of justice or in the denial . . . of a fair trial.” State v. Odom, 307 N.C. 655,

660, 300 S.E.2d 375, 378 (1983) (internal quotation marks and citation omitted). An

appellate court should only find plain error if the court is convinced that absent the

error the jury probably would have reached a different result. State v. Walker, 316

N.C. 33, 39, 340 S.E.2d 80, 83 (1986).

 A trial court’s rulings on relevancy are given great deference on appeal. Dunn

v. Custer, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004). We review de novo a trial

court’s legal conclusion that evidence is or is not within the Rule 404(b) exception to

 - 13 -
 STATE V. ROBERTS

 Opinion of the Court

the exclusion of character evidence. State v. Beckelheimer, 366 N.C. 127, 130, 726

S.E.2d 156, 158-59 (2012).

 “Relevant evidence means evidence having any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence.” N.C. Gen. Stat. 8C-1, Rule 401

(2018). Irrelevant evidence is inadmissible. N.C. Gen. Stat. 8C-1, Rule 402 (2018).

 “Evidence of other crimes, wrongs, or acts is not admissible to prove the

character of a person in order to show that he acted in conformity therewith.” N.C.

Gen. Stat. 8C-1, Rule 404(a) (2018). Evidence of prior bad acts “may, however, be

admissible for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake, entrapment or

accident.” N.C. Gen. Stat. 8C-1, Rule 404(b) (2018). “Rule 404(b) evidence is

admissible to prove identity when the defendant is not definitely identified as the

perpetrator of the alleged crime.” State v. Gray, 210 N.C. App. 493, 508, 709 S.E.2d

477, 488 (2011) (citation omitted).

 Defendant stated in one of the interviews that being a suspect of the

Hayeswood Hut murder was similar to his previous situation, when he was charged

with rape in 2002. Defendant described to investigators that, at that time, other

people said he was “running around drinking”—just as some were doing in this case.

The State argues that this evidence was admissible to “show opportunity, intent,

 - 14 -
 STATE V. ROBERTS

 Opinion of the Court

preparation, plan, knowledge, absence of mistake, entrapment or accident, and most

importantly in this case, identity.”

 However, we need not determine whether the evidence was admissible

because, even assuming error arguendo, Defendant has failed to show that the

admission of the evidence resulted in a miscarriage of justice or denied Defendant a

fair trial. See Odom, 307 N.C. at 660, 300 S.E.2d at 378. In light of the overwhelming

evidence of Defendant’s guilt, including his identity as the shooter, as recited above

in section IV.A., we do not conclude that absent admission of the evidence, the jury

probably would have reached a different result. Walker, 316 N.C. at 39, 340 S.E.2d

at 83. Accordingly, we discern no plain error.

C. Sentencing

 Defendant next argues that the sentence imposed by the trial court was not

supported by the jury’s verdict. Defendant specifically contends that the general

verdict of guilty of second-degree murder was ambiguous for sentencing purposes,

and because there was evidence in this case of depraved-heart malice, the trial court

erred by imposing a sentence for a class B1 offense. Defendant urges this Court to

remand the case for resentencing as a B2 offense.

 “We review de novo whether a sentence imposed was authorized by a jury’s

verdict.” State v. Mosley, 806 S.E.2d 365, 367 (N.C. Ct. App. 2017) (internal quotation

marks and citations omitted).

 - 15 -
 STATE V. ROBERTS

 Opinion of the Court

 Second-degree murder is the unlawful killing of another human being with

malice but without premeditation or deliberation. State v. Coble, 351 N.C. 448, 449,

527 S.E.2d 45, 47 (2000) (internal citation omitted).

 Malice is an essential element of second-degree murder.
 North Carolina recognizes at least three malice theories:
 (1) express hatred, ill-will or spite; (2) commission of
 inherently dangerous acts in such a reckless and wanton
 manner as to manifest a mind utterly without regard for
 human life and social duty and deliberately bent on
 mischief; or (3) a condition of mind which prompts a person
 to take the life of another intentionally without just cause,
 excuse, or justification.

Mosley, 806 S.E.2d at 367 (internal quotation marks and citations omitted). The

second enumerated malice theory is known as depraved-heart malice. Id. While

second-degree murder is generally punished as Class B1 felony, when the malice

necessary to prove second degree murder is depraved-heart malice,1 a second-degree

murder is punished as a Class B2 felony. N.C. Gen. Stat. § 14-17(b)(1) (2017).

 In State v. Lail, this Court held that the trial court did not err by sentencing

defendant as a B1 felon upon a general verdict of guilty of second-degree murder

where there was no evidence presented that would support a finding of depraved-

heart malice or an instruction on that theory. 251 N.C. App. 463, 476, 795 S.E.2d,

401, 411 (2017). Moreover, the defendant did not rebut the State’s malice theory,

advance a depraved-heart malice theory argument, or request a jury instruction on

 1 N.C. Gen. Stat. § 14-17(b)(2) describes a second circumstance wherein a second-degree
murder is punished as a B2 felony; that provision is inapplicable to this case.

 - 16 -
 STATE V. ROBERTS

 Opinion of the Court

depraved-heart malice. Id. at 475, 795 S.E.2d at 410. “Although the jury was not

instructed to answer under what malice theory it convicted defendant of second-

degree murder, it [wa]s readily apparent from the evidence presented and

instructions given that the jury, by their verdict, found defendant guilty of B1 second-

degree murder.” Id. See also Mosley, 806 S.E.2d at 368-69 (holding that a general

verdict of guilty of second-degree murder was ambiguous and thus should be

construed in favor of defendant as consistent with § 14-17(b)(1) because there was not

only evidence supporting Class B1 malice but also evidence from which the jury could

have found Class B2 depraved-heart malice).

 The present case is analogous to Lail. The State’s theory was that Defendant

intended to kill people at the basketball court, and the State’s evidence supported

only malice theories punishable as B1 felonies. The jury was only instructed on

malice theories punishable as B1 felonies; Defendant did not object to the jury

instructions and did not request an instruction on depraved-heart malice. Moreover,

Defendant did not advance a depraved-heart malice theory argument or present

evidence that would be consistent with a depraved-heart malice theory. See Lail, 251

N.C. App. at 475, 795 S.E.2d at 410. “Although the jury was not instructed to answer

under what malice theory it convicted defendant of second-degree murder, it [wa]s

readily apparent from the evidence presented and instructions given that the jury, by

 - 17 -
 STATE V. ROBERTS

 Opinion of the Court

their verdict, found defendant guilty of B1 second-degree murder.” Id. Accordingly,

the sentence imposed for a B1 offense was properly supported by the jury’s verdict.

D. Prior Record Level

 Defendant argues that his stipulation on the prior record level worksheet was

insufficient to support the trial court’s legal conclusion that Defendant was a prior

record level IV offender with ten felony sentencing points. Defendant urges this

Court to remand the case to the trial court for sentencing as a Level III offender.

 We review a trial court’s determination of an offender’s prior record level,

which is a conclusion of law, de novo on appeal—even when the parties have

stipulated to prior convictions on a record level worksheet. State v. Massey, 195 N.C.

App. 423, 429, 672 S.E.2d 696, 699 (2009).

 Stipulation by the parties is sufficient to prove the existence of a prior

conviction for sentencing purposes. N.C. Gen. Stat. § 15A-1340.14(f)(1) (2018). When

a defendant stipulates to a conviction on a prior record level worksheet, “he is

stipulating that the facts underlying his conviction justify that classification.” State

v. Arrington, 371 N.C. 518, 522, 819 S.E.2d 329, 332 (2018) (holding that, while

“second-degree murder has two potential classifications, B1 and B2, depending on the

facts,” when defendant stipulated to the conviction as a B1 offense, he “properly

stipulated that the facts giving rise to the conviction fell within the statutory

definition of a B1 classification”).

 - 18 -
 STATE V. ROBERTS

 Opinion of the Court

 Moreover, the trial court has “no duty to pursue further inquiry or make [the]

defendant recount the facts during the hearing.” State v. Salter, 826 S.E.2d 803, 809

(N.C. Ct. App. 2019) (internal quotation marks and citation omitted). However, if

there is clear record evidence “conclusively showing a defendant’s stipulation is to an

incorrect classification” due to error or mistake, then “a reviewing court should defer

to the record evidence rather than a defendant’s stipulation.” State v. Green, 831

S.E.2d 611, 617 (N.C. Ct. App. 2019) (holding that the trial court erred by assigning

points according to defendant’s stipulation to felony classification, when a certified

copy of the judgment showing conviction of misdemeanor had been presented to the

trial court).

 In this case, Defendant stipulated on the prior record level worksheet to the

following prior conviction: “M-PUBLIC DISTURBANCE . . . Class 1.” Defendant

argues that because “public disturbance” is a statutorily defined term under N.C.

Gen. Stat. § 14-288.1(8) that applies to more than one misdemeanor classification

under the “disorderly conduct” statute, N.C. Gen. Stat. § 14-288.4, the stipulation was

too general to support the trial court’s conclusion that the prior offense was a Class 1

misdemeanor.2 While there are multiple potential misdemeanor classifications of

disorderly conduct, see N.C. Gen. Stat. § 14-288.4(c) (2017), Defendant stipulated to

 2 Defendant also argues that the stipulation to public disturbance was identified with a 2005
file number, even though it listed a conviction date of 1996, and thus the stipulation was “incoherent,”
rendering it “impossible for the information on the prior record level worksheet . . . to be accurate.”
We find no merit in this argument.

 - 19 -
 STATE V. ROBERTS

 Opinion of the Court

a Class 1 misdemeanor on his prior record level worksheet. In so doing, Defendant

stipulated that the facts underlying his conviction justified that classification. See

Arrington, 371 N.C. at 522, 819 S.E.2d at 332. The trial court had “no duty to pursue

further inquiry or make defendant recount the facts during the hearing[,]” Salter, 826

S.E.2d at 803, and there is no record evidence suggesting that Defendant stipulated

to an incorrect classification due to error or mistake, see Green, 831 S.E.2d at 617.

 Accordingly, Defendant’s stipulation on the prior record level worksheet was

sufficient to support the trial court’s calculation of sentencing points based on this

prior conviction.

 V. Conclusion

 For the reasons explained above, we conclude that the trial court did not

commit prejudicial error by admitting recordings of Defendant’s phone calls with

others from jail and did not commit plain error by admitting videos of his interviews

with investigators. We also conclude that the trial court imposed a sentence that was

authorized by the jury’s verdict and properly calculated Defendant’s prior record

level.

 NO PREJUDICIAL ERROR.

 Chief Judge MCGEE and Judge BERGER concur.

 - 20 -