An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-351

Filed 4 March 2026

Wayne County, Nos. 22CR000245-950, 22CR050290-950

STATE OF NORTH CAROLINA

v.

MAURICE LARMAR GREENE, JR., Defendant.

Appeal by defendant from judgments entered 26 January 2024 by Judge William W. Bland in Wayne County Superior Court. Heard in the Court of Appeals 29 January 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Megan Shook, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant.*

FLOOD, Judge.

Defendant Maurice Larmar Greene, Jr., appeals from judgments entered upon his convictions for second degree murder and concealment of the death of a person. On appeal, Defendant argues the trial court: first, plainly erred by failing to instruct the jury on the depraved-heart theory of malice, which resulted in Defendant being

punished as a Class B1 felon instead of a Class B2 felon; and, second, erred by finding as an aggravating factor that the offense of concealment of death of a person "was committed to hinder the lawful exercise of a governmental function or enforcement of laws." For the following reasons, we hold the trial court did not err, let alone plainly err, by failing to instruct the jury on the depraved-heart theory of malice, where there was no evidence to support a depraved-heart theory of malice. We further hold the trial court did not err in sentencing Defendant in the aggravated range, where the State, in addition to providing sufficient evidence to prove the underlying offense, provided sufficient evidence to support submitting the aggravating factor to the jury.

## I. **Factual and Procedural Background**

On 23 January 2021, Defendant went to watch a UFC fight at the house of a family friend, John Raiford. While at Raiford's house, Defendant pulled out a handgun and showed it to his other family friend, Clarence Carraway. Since Defendant had been drinking, Carraway and Raiford asked Defendant to leave the gun with them or take it to his father's house, but Defendant declined. When the UFC fight ended, Defendant left Raiford's home sometime after midnight.

Around 3:30 a.m. on 24 January 2021, Defendant's father was woken up by the ring of his doorbell and Defendant knocking on his front door. Defendant told his father that Gloria, Defendant's girlfriend, "tried to take my gun, and the gun went off, and it shot her." Defendant's father asked his son where Gloria was. Defendant told him that Gloria was "on the side of the road" but did not provide any further

details. Defendant's father told Defendant that he needed to go back to where Gloria was and call 911. Defendant then left his father's home and drove to Prince George's County, Maryland.

Later that afternoon, Defendant's father and Carraway discussed their concerns over Gloria's wellbeing and decided they would go to Defendant's apartment to find her. They did not find Gloria at the apartment, but they did see that her car was parked outside. Later that evening, around 6:36 p.m., Carraway received a text from Defendant asking him to tow Gloria's car. After Carraway told Defendant that he was not going to tow the car, Defendant told Carraway to delete their text messages regarding Gloria and sent the "hush emoji." Defendant also told Carraway that Defendant had nothing to do with Gloria's disappearance.

Unbeknownst to Defendant's father and Carraway, Gloria's body had been discovered by law enforcement around 9:16 a.m. on 24 January 2021. Law enforcement officers found Gloria's body on the side of Casey Mill Road, a two-lane country road in a rural area. Gloria's body was found on her stomach with her pants and underwear pulled down to her ankles and her bra pulled above her breasts.

An autopsy of Gloria's body revealed that she had suffered from blunt force trauma to her chest, abdomen, and pelvis, and her blood alcohol content was 0.25. The medical examiner concluded that Gloria died from a gunshot wound to her chest. The autopsy also showed that a bullet entered Gloria's body near her armpit; passed from right to left in her body between her third and fourth ribs, through her heart

and right lung; and came to rest in the left side of her chest but did not exit her body, which caused a large amount of internal bleeding contributing to her death.

The Wayne County Sheriff's Office issued a warrant for Defendant's arrest on 25 January 2021. The following day, a detective of the Prince George's County Police Department in Marlboro, Maryland, served the warrant. On 28 January 2021, State Bureau of Investigation Agent Aaron Banks and Detective C. L. Johnson of the Wayne County Sheriff's Office traveled to Prince George's County to locate and transport Defendant's car back to Wayne County. On 6 June 2022, a Wayne County grand jury returned two true bills of indictment against Defendant for first degree murder and concealment of death.

Defendant's case came on for trial in Wayne County Superior Court on 16 January 2024. After the State presented its evidence, Defendant elected to testify. Defendant testified that, although he did not have any training with firearms, he usually carried a .22 caliber pistol for protection on his waistband under his coat with "one in the chamber with the safety off."

Defendant also testified that, on 23 January 2021, he went to his apartment after leaving the UFC fight watch party at Raiford's house. When he arrived, Gloria was at his apartment. Defendant testified that Gloria "was very drunk and angry[,]" and "she tried to grab [his] hair and to punch [him.]" In an effort to prevent Gloria from "attacking" him, Defendant "tried to grab her arms[,]" at which point "she reached for [his] waistband and grabbed [his] gun[.]" Defendant then testified,

> so now I'm trying to, trying to get her -- prevent her from getting possession of the gun, so we're wrestling over the gun, and she's kind of -- she's trying to, she's pulling on it, and I'm pulling on it, but I'm not trying to add too much force to the point where it causes any harm to either one of us, so I'm just trying to get it back from her and she's just pulling on it and then it just -- she just fell back, pow, and then the gun just discharged, and then the next thing I know she just fell to the floor.

Defendant explained that he was holding the gun when it discharged, killing Gloria, but clarified that his finger was not on the trigger. Defendant stated that "the trigger doesn't have to be pulled for the gun to go off" and that he did not intentionally shoot Gloria.

Defendant further testified that, after not seeing see any blood on Gloria's body, he lifted Gloria's shirt over her breasts and pulled her pants and underwear down "between her knees and her thighs" to check for gunshot wounds. He "did not find any gunshot wound." After realizing Gloria was dead, Defendant grabbed the gun off the counter and put Gloria's body in his vehicle. Once he pulled out of his apartment complex, Defendant "tossed the gun." Defendant claimed that, when he first started driving, his initial goal was to get Gloria help. As he was driving, Defendant realized that he had been driving aimlessly and started to fear that people would not believe his story. Defendant then stopped driving, unloaded Gloria's body onto Casey Mill Road, and drove to his father's house.

On 26 January 2024, the jury returned guilty verdicts for second degree murder and concealment of death. During sentencing, the trial judge imposed an

aggravated sentence with respect to the concealment of death charge after finding the mitigating factor of a support system in the community was outweighed by the aggravating factor of disruption or hindrance of the lawful exercise of a governmental function or the enforcement of laws. In the first judgment for second degree murder, the trial court sentenced Defendant at prior record level I, Class B1, to an active punishment of 240 to 300 months of imprisonment. In the second judgment for concealment of death, the trial court sentenced Defendant at prior record level I, Class D, to an active punishment of 80 to 108 months of imprisonment. Following announcement of the judgments, Defendant gave oral notice of appeal in open court.

## II. <u>Jurisdiction</u>

Appeal to this Court lies of right from the final judgment of a superior court pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. <u>Analysis</u>

On appeal, Defendant argues that the trial court (A) plainly erred by failing to instruct the jury on the depraved-heart theory of malice, which resulted in Defendant being punished as a Class B1 felon instead of a Class B2 felon; and (B) erred by finding as an aggravating factor that "[t]he offense was committed to hinder the lawful exercise of a governmental function or enforcement of laws." We address each argument, in turn.

### A. Jury Instructions

Defendant first contends that the trial court plainly erred by failing to instruct

the jury on the depraved-heart theory of malice. Defendant further argues that the trial court's failure to instruct the jury on the depraved-heart theory of malice resulted in Defendant being unjustly punished as a Class B1 felon instead of a Class B2 felon. We disagree.

"The plain error standard of review applies on appeal to unpreserved instructional or evidentiary error." *State v. Lawrence*, 365 N.C. 506, 518 (2012). As our Supreme Court has emphasized, the plain error rule "is always to be applied cautiously and only in the exceptional case[.]" *State v. Odom*, 307 N.C. 655, 660 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)). To succeed under the plain error rule, the "defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440 (1993) (citing *State v. Faison*, 330 N.C. 347 (1991)).

"It is well settled that a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts." *State v. Drumgold*, 297 N.C. 267, 271 (1979) (citation and internal quotation marks omitted). "An instruction on a lesser-included offense must be given only if the evidence would permit the jury to rationally find defendant guilty of the lesser offense and to acquit him of the greater." *State v. Clark*, 201 N.C. App. 319, 323 (2009) (citation omitted). "When determining whether there is sufficient evidence for submission of a lesser included offense to the jury, we view the evidence in the light

most favorable to [the] defendant." *Id.* (citation omitted). "An instruction on depraved-heart malice would be warranted when there is evidence presented at trial that would support a finding that a defendant acted with depraved-heart malice." *State v. Swinson*, 918 S.E.2d 232, 240 (N.C. Ct. App. 2025).

"Malice is an essential element of second degree murder." *State v. Lail*, 251 N.C. App. 463, 469 (2016); *see also State v. Brewer*, 328 N.C. 515, 522 (1991) ("Intent to kill is not a necessary element of second-degree murder, but there must be an intentional act sufficient to show malice."). North Carolina recognizes three types of malice:

> (1) express hatred, ill-will or spite; (2) commission of inherently dangerous acts in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief; or (3) a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.

*State v. Coble*, 351 N.C. 448, 450–51 (2000) (citation and internal quotation marks omitted). The second type of malice is generally known as "depraved-heart malice." *State v. Fuller*, 138 N.C. App. 481, 484 (2000). A person who is convicted "based on the first or third malice forms [must] be treated as [a] B1" felon. *Lail*, 251 N.C. App. at 470. In the case where a person commits second degree murder with depraved-heart malice, however, that person must be punished as a B2 felon. *See* N.C.G.S. § 14-17(b) (2023) ("[A] person who commits second degree murder shall be punished as a Class B2 felon if the malice necessary to prove second degree murder is based on an

inherently dangerous act or omission, done in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.").

Generally, a verdict would be ambiguous for the purpose of sentencing where "the jury is charged on second-degree murder and presented with evidence that may allow them to find that either B2 depraved-heart malice or another B1 malice theory existed." *Lail*, 251 N.C. App. at 475. If ambiguity exists, "courts cannot speculate as to which malice theory the jury used to support its conviction of second-degree murder." *Id.*

Here, Defendant argues that there was evidence indicating that he acted with depraved-heart malice. To support this proposition, Defendant relies on *State v. Mosley*, 256 N.C. App. 148 (2017). In *Mosley*, the defendant was charged with first degree murder after he fatally shot the victim with a .22 rifle. *Id.* at 149. At trial, the defendant testified that he shot the victim but claimed that it was an accident. *Id.* The defendant further explained that he was holding the rifle in his left hand with his finger on the trigger when the victim reached towards the barrel of the rifle. *Id.* When the victim reached for the rifle, the defendant "took it away from her, and that's when the gun went off." *Id.* (brackets omitted). The defendant also testified that he never had any safety training and that he "always carried the rifle around with his finger on the trigger and that he never used the safety." *Id.* The trial court instructed the jury regarding the first and third types of malice but did not instruct the jury

regarding depraved-heart malice. *Id.* The jury subsequently found the defendant guilty of second degree murder, and the trial court sentenced the defendant as a B1 felon. *Id.* at 149–50. On appeal, the defendant argued the trial court erred by punishing him as a B1 felon when there was sufficient evidence that a jury could have found the defendant acted with depraved-heart malice and thus convict him of a B2 second degree murder. *Id.* at 153. After reviewing the evidence, this Court concluded that the following evidence indicated the defendant recklessly used his rifle:

> Specifically, [the] defendant testified that as he was arguing with the victim, he was holding the rifle with his finger on the trigger and without the safety on. [The d]efendant stated this was how he always handled the rifle—finger on the trigger and no safety. [The d]efendant testified that in this instance, the gun went off when the victim grabbed the barrel of the rifle and he pushed her away. There was also testimony about the safety on the rifle and testimony from a firearm expert that "[y]ou would never teach anyone to have their finger on the trigger until they are ready to fire." Moreover, the State argued to the jury that [the] defendant's actions amounted to more than criminal negligence, claiming that [the] defendant's handling of the rifle amounted to "gross recklessness or carelessness as to amount to the heedless indifference to the safety and rights of others."

*Id.* at 152–53. Since the jury's verdict was silent as to whether the jury convicted the defendant of a Class B1 or Class B2 second degree murder, and there was evidence to support a verdict on a Class B1 and Class B2 second degree murder, we concluded that the jury verdict was ambiguous for sentencing purposes. *Id.* at 153. Thus, we vacated the defendant's sentence and remanded the matter for resentencing. *Id.*

Similar to *Mosley*, Defendant testified that he was holding the gun when it discharged. *See id.* at 149. But, unlike the defendant in *Mosley*, who testified he "always carried the rifle around with his finger on the trigger," Defendant in the instant case testified his finger was *not* on the trigger and that the gun discharged as he was trying "to get it back from" Gloria. *See id.* at 152–53. Further, unlike the firearm expert's testimony in *Mosley*, no one in the instant case testified as to whether Defendant recklessly handled the weapon in a manner which would have amounted to reckless behavior. *See id.* at 152–53.

Instead, we find *Swinson* to be instructive. In *Swinson*, the defendant engaged in a physical fight with the victim and another woman. 918 S.E.2d at 239. At trial, the State presented evidence tending to show that the defendant intentionally shot the victim two times. *Id.* Contrary to the State's evidence, however, the defendant testified that she never fired the gun; rather, the gun went off when the victim kept jumping on her as she was holding the gun. *Id.* The trial court instructed the jury regarding the first and third theories of malice but did not instruct the jury regarding the depraved-heart theory of malice. *Id.* at 240. The jury subsequently returned a verdict finding the defendant guilty of second degree murder, and the trial court sentenced the defendant as a B1 felon. *Id.* On appeal, the defendant argued that the trial court erred by sentencing her as a Class B1 felon instead of a Class B2 felon because there was sufficient evidence that a jury could have found that the defendant acted with depraved-heart malice. *Id.* at 238. The *Swinson* Court distinguished

*Mosley* on the ground that "there was no 'evidence of [the] defendant's reckless use of a deadly weapon.'" *Id.* at 239 (quoting *Mosley*, 256 N.C. App. at 152) (citation modified). Notably, rather than providing evidence that she used the firearm in a reckless manner, like the defendant in *Mosley*, the defendant in *Swinson* testified that she did not *use* the firearm at all. *Id.* Thus, after reviewing the evidence, this Court concluded:

> Neither version of events—the State's version in which defendant intentionally fired two shots, or defendant's version in which she did nothing wrong and the gun mysteriously fired two shots—constitute the kind of reckless conduct that could support depraved-heart malice. Based on the evidence presented at trial, the jury only could have found defendant guilty of second-degree murder under the theories that support sentencing as a Class B1 felon.

*Id.* at 239–40. Consequently, we held that trial court did not err because the evidence, "even in the light most favorable to [the] defendant, could not support a finding that [the] defendant acted with depraved-heart malice because the evidence does not demonstrate reckless use of the firearm." *Id.* at 240.

Here, similar to the defendant in *Swinson*, Defendant denied intentionally pulling the trigger and explained that "the gun just discharged[.]" *See id.* at 239. When the State asked Defendant how the gun discharged, Defendant stated that "the trigger doesn't have to be pulled for the gun to go off." Further, Defendant's testimony that he was "not trying to add too much force to the point where it causes any harm to" Defendant or Gloria suggests that Defendant was not acting "in such a reckless

- 12 -

and wanton manner as to manifest a mind utterly without regard for human life[.]" *See Coble*, 351 N.C. at 450–51. As such, in reviewing the evidence in the light most favorable to Defendant, we conclude the evidence in this case did not support a finding that Defendant acted with depraved-heart malice. *See Clark*, 201 N.C. App. at 323; *see also Swinson*, 918 S.E.2d at 240. Therefore, "the trial court did not err, let alone plainly err, by failing to instruct the jury on the depraved-heart theory of malice." *See Swinson*, 918 S.E.2d at 240.

## B. Aggravating Factor

Defendant next argues the trial court erred by finding as an aggravating factor that the offense of concealment of death "was committed to hinder the lawful exercise of a governmental function or enforcement of laws." Specifically, Defendant argues the trial court erred by sentencing him in the aggravated range because evidence used to prove elements that are inherent in the concealment of death conviction "may not be [considered] as aggravating factors."

"[A]n error at sentencing is not considered an error at trial for the purpose of N.C. Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure." *State v. Owens*, 205 N.C. App. 260, 266 (2010). Thus, even if the defendant fails to object, this Court reviews alleged sentencing errors de novo. *State v. Patterson*, 269 N.C. App. 640, 645 (2020); *State v. Gamble*, 274 N.C. App. 425, 427 (2020). Under de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33

(2008) (internal citation and quotations omitted).

Generally, the State bears "the burden of proving beyond a reasonable doubt that an aggravating factor exists . . . ." N.C.G.S. § 15A-1340.16(a) (2023). "Evidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation." N.C.G.S. § 15A-1340.16(d) (2023). As our Supreme Court has held, however, "when an aggravating factor is established by evidence *that is in addition* to the evidence necessary to prove an element of the underlying offense, the aggravating factor may properly be considered under section 15A-1340.16(d)." *State v. Facyson*, 367 N.C. 454, 459 (2014) (citing *State v. Thompson*, 309 N.C. 421, 422 (1983) (emphasis added).

Defendant in the instant case was charged with concealment of the death of a person who did not die of natural causes, in violation of N.C.G.S. § 14-401.22(a). The elements of concealment of death are: (1) "fail[ure] to notify a law enforcement authority of the death or secretly buries or otherwise secretly disposes of a dead human body[;]" (2) intent to conceal the death of a person; and (3) knowing or having reason to know the person did not die of natural causes. N.C.G.S. §§ 14-401.22(a), (e) (2023). Thus, to convict Defendant of concealing the death of Gloria, the State would have to prove to the jury that Defendant had the specific *"intent to conceal the death of"* Gloria. *See State v. Maldonado*, 241 N.C. App. 370, 374 (2015) ("Specific-intent crimes are crimes which have as an essential element a specific intent that a *result* be reached . . . ."); *see also State v. Powell*, 921 S.E.2d 603, 608 (N.C. Ct. App. 2025)

(discussing a specific intent crime and the necessary "intent to kill," stating that "[t]he State must prove that Defendant had the specific intent to kill [the v]ictim during the assault").

Here, the State provided evidence of Defendant's intent to conceal the death of Gloria by secretly disposing of her body on Casey Mill Road. Specifically, the State presented evidence showing Defendant knew Gloria was dead when he disposed of her body on Casey Mill Road, refused to tell his father where Gloria's body was located, and asked Carraway to tow Gloria's car and to delete their text messages regarding Gloria's disappearance. Consequently, the jury found the State met its burden and convicted Defendant of concealing the death of a person who did not die of natural causes.

The jury also found the aggravating factor that "[t]he offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." *See* N.C.G.S. § 15A-1340.16(d)(5) (2023). Defendant argues that the specific "intent to conceal the death of a person" necessarily encompasses the aggravating factor that "[t]he offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." Our Supreme Court, however, has rejected similar arguments where the State presented evidence to support the underlying crime and additional evidence, although similar, to support an aggravating factor. *See Thompson*, 309 N.C. at 422 (holding that the State may introduce evidence of an attempted taking of property of great monetary value as an

aggravating factor because that evidence is not required to prove the underlying felony larceny offense itself); *Facyson*, 367 N.C. at 461 (holding that acting-in-concert liability does not preclude applying the aggravating factor for joining with more than one other person, because the factor requires proof beyond the basic acting-in-concert doctrine); *State v. Bruton*, 344 N.C. 381, 394 (1996) (permitting the use of an aggravating factor where the aggravating factor was supported by "[d]iscrete evidence" from the evidence necessary to support the defendant's conviction).

Here, the specific intent under N.C.G.S. § 14-401.22(a) is different from the intent under N.C.G.S. § 15A-1340.16(d)(5). While the aggravating offense requires the State to prove that Defendant committed the offense "to disrupt or hinder the lawful exercise of any governmental function," the concealment of death of a person charge only requires the State to prove Defendant had the intent "to conceal the death of a person." In addition to the evidence indicating Defendant's intent to conceal Gloria's death, the State also presented evidence showing that Defendant concealed Gloria's death "to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws[,]" as Defendant himself testified that he did not take Gloria to the hospital because nobody was going to believe him and that he failed to notify law enforcement of her death. This additional evidence supported the aggravating factor that Defendant "committed [the offense] to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." Thus, the State provided discrete evidence to support the concealment of death charge and the

aggravating factor. *See Bruton*, 344 N.C. at 394.

Accordingly, because the State provided to the jury discrete evidence for both the underlying offense of concealment of death and the aggravating factor, the use of the aggravating factor in Defendant's sentencing was proper. As such, the trial court did not err in sentencing Defendant in the aggravated range.

## IV. Conclusion

We hold the trial court did not err, let alone plainly err, by failing to instruct the jury on the depraved-heart theory of malice where the evidence did not support a finding that Defendant acted with depraved-heart malice. We also hold the trial court did not err in sentencing Defendant in the aggravated range where the State provided to the jury discrete evidence for both the underlying offense of concealment of death and the aggravating factor.

NO ERROR.

Judges COLLINS and MURRY concur.

Report per Rule 30(e).